UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Stacy Abron, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　- against -<br><br>Vi-Jon, LLC,<br><br>　　　　　　　　　　Defendant | 3:22-cv-50238<br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.　　Vi-Jon, LLC ("Defendant") manufactures, markets, labels and sells 3% hydrogen peroxide solution to be used "For treatment of minor cuts and abrasions," under the Swan brand ("Product").

I.　　**HISTORY OF HYDROGEN PEROXIDE**

2.　　In the context of first aid, an antiseptic is a chemical with antimicrobial activity, applied to skin to help prevent infection in minor cuts, scrapes, and burns.

3.　　Common antiseptics include rubbing alcohol (71%) and hydrogen peroxide (3%).

4.　　Hydrogen peroxide was discovered in 1818 by French chemist Louis Jacques Thénard.

5.　　It is formed when atmospheric oxygen reacts with water to form H2O2.

6.　　Hydrogen peroxide was first used commercially to bleach hats and has multiple safe home cleaning applications.

7.　　Its earliest medical uses was to treat conditions including typhoid, diphtheria, bowel infections, eczema, epilepsy, influenzal pneumoniae, bladder infections, infected wounds and even

as an intravenous source of oxygen during cardiopulmonary resuscitation.

8. However, Alexander Fleming discovered that wounds treated with antiseptics like hydrogen peroxide had higher death rates and slower healing than wounds not treated at all.

## II. FOLKLORE SUPPORTS USE OF HYDROGEN PEROXIDE

9. A prominent doctor noted that a "dangerous medical myth[s] is the widespread belief by patients that copious amounts of hydrogen peroxide should be applied to cuts and scrapes."[1]

10. Often, such patients will say, "My mom (or grandma) told me to clean it [a cut] out good with hydrogen peroxide."

11. One writer humorously noted, that "after centuries of blindly trusting the stuff, scientists have found that hydrogen peroxide doesn't prevent bacterial growth or reduce the risk of infection at incision sites. In fact, it may actually slow the healing process."[2]

12. When hydrogen peroxide is applied to a cut, the catalase instantly converts hydrogen peroxide into water and oxygen.

13. This generates a fizzing reaction, that helps remove debris, which is why it is described as an oral debriding agent, used in dentistry.

14. Though this fizzing may look like germ-killing, the only thing dying is the body's fibroblasts, the skin cells responsible for healing cuts.

## III. MISLEADING TO PROMOTE HYDROGEN PEROXIDE TO TREAT CUTS

15. The Product is identified as a "First Aid Antiseptic [and] Oral Debriding Agent."

---

[1] Michael Daignault, M.D., "Everyone puts hydrogen peroxide on their wounds. They really shouldn't." USA TODAY, 2 Feb. 2022; Medical Myths Medical Myth Buster: Hydrogen Peroxide and Wounds https://www.atlanticfeet.com/blog/medical-myth-buster-hydrogen-peroxide-and-wounds Roger on Tuesday, 09 June 2015; 9 First Aid Mistakes You're Probably Making By Aviva Patz Jul 2, 2015 https://www.prevention.com/health/a20469350/first-aid-mistakes/
[2] Cracked Writers, Bad News, Everybody: Hydrogen Peroxide Is Useless, Jan. 3, 2018.

2



16. Beneath this the Product's use is described as "For Treatment of Minor Cuts & Abrasions" and "For Use As a Gargle or Rinse."

17. The back panel Drug Facts identifies the "Active ingredient [as] Hydrogen peroxide

3%," described as a "First aid antiseptic/oral debriding agent" that is "Use[d] [as] first aid to help prevent the risk of infection in minor cuts, scrapes and burns."



18. The "Uses" describe the Product as "first aid to help prevent the risk of infection in minor cuts, scrapes and burns.

19. Next to "Directions," the label states "apply a small amount of product on the affected area 1 to 3 times a day."

20. The statement that the Product will prevent the risk of infection is false because studies show hydrogen peroxide is ineffective in preventing infection in minor cuts, scrapes and

4

burns.[3]

21. The statement that the Product will prevent the risk of infection is misleading because studies show that to the extent hydrogen peroxide destroys possibly harmful bacteria, it destroys a greater amount of beneficial bacteria and the surrounding skin tissue, and the result is a slower healing process.

22. While hydrogen peroxide has antiseptic properties, the Mayo Clinic and numerous medical studies advise that it does not help treat minor cuts and abrasions and causes more harm than good.[4]

23. Dictionaries define "treat" as attempting to heal, improve or cure a condition.

24. In response to a cut or abrasion, platelets release fibrin to form a clot and seal the wound.

25. White blood cells called macrophages rush to the area to destroy bacteria that gets past the clot and oversee the repair process.

26. Macrophages also secrete growth factors which help repair the wound.

27. Blood vessels then dilate to allow fresh nutrients and oxygen to flow to the area and facilitate healing.

28. The representation "For treatment of minor cuts & abrasions," tells the consumer hydrogen peroxide will assist in the healing process and shorten healing time.

29. However, hydrogen peroxide does not treat minor cuts or abrasions.

---

[3] Anahad O'Connor The Claim: Hydrogen Peroxide Is a Good Treatment for Small Wounds, NY Times, June 19, 2007; Shifrah Combiths Why You Should Take Hydrogen Peroxide Out of Your First Aid Kit. The Kitchn, Apr 1, 2020.
[4] Mayo Clinic Staff, Cuts and scrapes: First aid, Nov. 17, 2021; Reid, C. J., M. Alcock, and D. Penn. "Hydrogen peroxide–a party trick from the past?." Anaesthesia and intensive care 39.6 (2011): 1004-1008; Cleveland Clinic, What Is Hydrogen Peroxide Good For? Dec. 1, 2021

5

30. Numerous studies found hydrogen peroxide ineffective at reducing bacterial counts and rates of wound infection.[5]

31. Though hydrogen peroxide may kill some potentially harmful bacteria, it destroys a greater amount of positive bacteria and healthy cells that promote healing.[6]

32. Other studies confirm hydrogen peroxide causes increased risk of infection, corrosive tissue damage and irreversibly worsens scarring.

33. The application of hydrogen peroxide can cause severe toxicity, including inflammation and blistering.

34. These fact have been known to mainstream science since at least Fleming's work.

35. Hydrogen peroxide can also cause rapid oxygen release resulting in systemic gas embolus.

36. In adults, as little as 20 ml of 1.5% hydrogen peroxide has been associated with haemodynamic instability, and even smaller volumes can cause cardiac arrest in children.

37. It was long thought that-the activity and growth of obligate anaerobes were inhibited or killed' by hydrogen peroxide because they lack the catalase possessed by some aerobes, e.g., Staphylococcus aureus.

38. The cell enzyme catalase adequately protects cells from damage by regulating steady-state levels of metabolically produced hydrogen peroxide.

39. This defense overwhelms concentrations of hydrogen peroxide used as a topical antiseptic.

---

[5] Carrie Madormo, RN, MPH, Should You Use Hydrogen Peroxide on Your Skin? Feb. 02, 2022, Medically reviewed by Leah Ansell, MD.
[6] Akuji, M. A., and D. J. Chambers. "Hydrogen peroxide: more harm than good?," BJA: British Journal of Anaesthesia 118.6 (2017): 958-959.

40. Reports from between 1940 and 1950 on the bacterial activity of hydrogen peroxide *in vitro* failed to consider the conditions which exist *in vivo* and include rapid breakdown in the presence of tissue, blood, and saliva.

41. Recent findings suggest that a highly reactive and very toxic superoxide formed by flavoenzymes inhibits anaerobes because they do not produce the superoxide dimutase produced by aerobes.

42. If a cut is serious, antiseptics like hydrogen peroxide should not be applied.

43. If a cut is minor enough to be treated at home, hydrogen peroxide will be unnecessary, with possibility of harm, because the body's normal functioning will repair the cut.

**IV. CONCLUSION**

44. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

45. Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

46. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

47. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

48. Had Plaintiff known the truth, she would not have bought the Product or would have paid less for it.

49. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $2.99 for 16 OZ, excluding tax and sales,

higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

50. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

51. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

52. Plaintiff Stacy Abron is a citizen of Illinois.

53. Defendant Vi-Jon, LLC is a Delaware corporation with a principal place of business in St. Louis, St. Louis County, Missouri.

54. The sole member of Defendant is Vi-Jon Holdings, Inc., a Delaware corporation with a principal place of business in Missouri.

55. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

56. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in thousands of locations across the States covered by Plaintiff's proposed classes.

57. The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online

58. Venue is in the Western Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Winnebago County, including Plaintiff's purchase, consumption, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

59. Plaintiff Stacy Abron is a citizen of Rockford, Winnebago County, Illinois.

60. Defendant Vi-Jon, LLC is a Delaware corporation with a principal place of business in St. Louis, Missouri, St. Louis County.

61. Defendant is a leading seller of over the counter personal care products including hand sanitizers, mouthwashes, and hydrogen peroxides.

62. In fact, the company was originally known as the Peroxide Company.

63. Plaintiff purchased the Product at locations including Dollar Tree, 526 E Jefferson St Rockford, IL 61107, between January 25, 2022 and May 25, 2022, among other times.

64. Plaintiff believed and expected the Product could treat minor cuts and abrasions because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

65. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

66. Plaintiff bought the Product at or exceeding the above-referenced price.

67. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

68. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

69. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

70. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

71. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar first aid antiseptic products, because she is unsure whether those representations are truthful.

## Class Allegations

72. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Alabama, South Carolina, Wyoming, Delaware, Alaska, West Virginia, Arkansas, and Oklahoma who purchased the Product during the statutes of limitations for each cause of action alleged.

73. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

74. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

75. Plaintiff is an adequate representative because her interests do not conflict with other members.

76. No individual inquiry is necessary since the focus is only on Defendant's practices

and the class is definable and ascertainable.

77. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

78. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

79. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

80. Plaintiff incorporates by reference all preceding paragraphs.

81. Plaintiff believed the Product could treat minor cuts and abrasions.

82. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

83. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

84. Plaintiff relied on the representations and omissions to believe the Product could treat minor cuts and abrasions.

85. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

86. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or

deceptive business practices in the conduct of commerce.

87. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

88. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

89. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

90. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

91. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that it could treat minor cuts and abrasions.

92. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

93. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

94. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it could treat minor cuts and abrasions.

95. Defendant's representations affirmed and promised that the Product could treat minor cuts and abrasions.

96. Defendant described the Product so Plaintiff believed it could treat minor cuts and abrasions, which became part of the basis of the bargain that it would conform to its affirmations and promises.

97. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

98. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted brand known for the highest quality products.

99. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

100. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

101. Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

102. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

103. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

104. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it could treat minor cuts and abrasions.

105. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it could treat minor cuts and abrasions, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

106. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

107. Defendant had a duty to truthfully represent the Product, which it breached.

108. This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted brand known for the highest quality products.

109. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

110. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

111. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

112. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

113. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

114. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it could treat minor cuts and abrasions.

115. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

116. Defendant knew of the issues described here yet did not address them.

117. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

### Unjust Enrichment

118. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory

claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: July 2, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com